# United States Court of Appeals
## For the First Circuit

No. 15-1261

UNITED STATES OF AMERICA,

Appellee,

v.

ABRAHAM WALKER-COUVERTIER,

Defendant, Appellant.

No. 15-1267

UNITED STATES OF AMERICA,

Appellee,

v.

DEAN LUGO-DÍAZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Selya and Lynch,
Circuit Judges.

Ines de Crombrugghe McGillion, with whom Ines McGillion Law Offices, PLLC was on brief, for appellant Walker-Couvertier.

Allison J. Koury for appellant Lugo-Díaz.

Finnuala K. Tessier, Attorney, Appellate Section, Criminal Division, United States Department of Justice, with whom Kenneth A. Blanco, Acting Assistant Attorney General, Trevor N. McFadden, Acting Principal Deputy Assistant Attorney General, Rosa Emilia Rodríguez-Vélez, United States Attorney, and José A. Contreras, Assistant United States Attorney, were on brief, for appellee.

June 15, 2017

**SELYA**, **Circuit Judge**.  In these consolidated criminal appeals, the defendants — represented by newly appointed counsel — offer up a salmagundi of arguments.  Virtually all of these arguments were either forfeited or waived in the court below.  Attempting to reinvent a case on appeal is a tactic that very rarely works — and it does not work here.  After careful consideration, we conclude that none of the components of the defendants' asseverational array withstands scrutiny under the largely inhospitable standards of review that apply.  Consequently, we affirm the defendants' convictions and sentences.

## I.  BACKGROUND

We start with a bird's-eye view of the facts — recited in the light most favorable to the jury's verdict, see United States v. Sepulveda, 15 F.3d 1161, 1172 (1st Cir. 1993) — and the travel of the case.

In 2012, agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives arrested dozens of members of a sprawling drug-trafficking ring operating mostly out of three public housing complexes in Carolina, Puerto Rico (El Coral, Lagos de Blasina, and El Faro).  David Oppenheimer-Torres (Oppenheimer), who headed this drug ring, typically hired project residents to package and sell various kinds of drugs to fellow inhabitants of their communities.  Many of Oppenheimer's associates carried firearms and used violence to carry out the drug ring's objectives.

Defendant-appellant Abraham Walker-Couvertier (Walker) toiled as a runner, responsible for delivering drugs to pushers at the three housing projects. He also served as an enforcer for the drug ring and sold drugs at the El Coral project. Walker participated in the conspiracy from 2006 to 2010. Defendant-appellant Dean Lugo-Díaz (Lugo) worked as a seller at the El Faro project. He was an active participant in the drug ring's business in two different time frames: for a period of time between late 2006 and early 2007 and again for a period of several months in early 2011.

In May of 2012, a federal grand jury returned a six-count indictment against Walker, Lugo, and seventy-two other individuals allegedly involved in the Oppenheimer drug ring. As relevant here, the indictment charged the defendants with conspiring to distribute and possess with intent to distribute specified amounts of heroin, cocaine, crack cocaine, and marijuana within 1,000 feet of a public housing facility (count one). See 21 U.S.C. §§ 841(a)(1), 846, 860. The indictment also charged the defendants with aiding and abetting the distribution and possession of the same drugs (counts two through five). See 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 860. Walker was separately charged with carrying a firearm during and in relation to a drug-trafficking crime (count six). See 18 U.S.C. § 924(c)(1)(A).

- 4 -

Of all the defendants, only Walker and Lugo opted to maintain their innocence. During the eight-day trial, the jury heard testimony from cooperating witnesses and police officers and viewed videotape and documentary evidence. At the close of the government's case-in-chief, Walker and Lugo each moved for judgment of acquittal. See Fed. R. Crim. P. 29(a). The court denied both motions, save that it granted Lugo's motion as to the charge of aiding and abetting the possession with intent to distribute heroin. The defendants unsuccessfully renewed their sufficiency challenges at the close of all the evidence.

The case went to the jury, which found both defendants guilty of conspiring to possess with intent to distribute at least one kilogram of heroin, five kilograms of cocaine, 280 grams of crack cocaine, and 100 kilograms of marijuana, all within 1,000 feet of a public housing facility. It also found both defendants guilty of aiding and abetting the possession with intent to distribute between 500 grams and five kilograms of cocaine and between twenty-eight and 280 grams of crack cocaine. Both defendants were found guilty of aiding and abetting the possession with intent to distribute marijuana within 1,000 feet of a public housing facility (Walker was found responsible for more than 100 kilograms, and Lugo was found responsible for between five and 100 kilograms). Walker also was found guilty of carrying a firearm during and in relation to a drug-trafficking crime. Finally, the

jury acquitted Walker of aiding and abetting the possession with intent to distribute heroin.

Lugo — but not Walker — renewed his motion for judgment of acquittal after the jury rendered its verdict.  See Fed. R. Crim. P. 29(c).  The district court denied the motion, see United States v. Lugo Díaz, 80 F. Supp. 3d 341, 360 (D.P.R. 2015), and ordered the probation department to prepare a presentence investigation report for each defendant.

In cases involving multiple types of drugs, drug quantities are converted into their marijuana equivalents and added together to aid in the calculation of the applicable guideline sentencing range (GSR).  See USSG §2D1.1, cmt. n.8(B), (D).  At Walker's disposition hearing, the court found him responsible for what amounted to 12,885.56 kilograms of marijuana and set his GSR at 188 to 235 months.  It sentenced him to concurrent 192-month terms of immurement on the drug counts and a consecutive 60-month term of immurement on the firearms count.  At Lugo's disposition hearing, the court found him responsible for the equivalent of 1,328.41 kilograms of marijuana and set his GSR at 121 to 151 months.  It sentenced him to concurrent 121-month terms of immurement on the various counts of conviction.  These timely appeals followed.

## II.  CHALLENGES TO THE CONVICTIONS

The defendants have advanced arguments that implicate both their convictions and their sentences.  We deal first with their conviction-related claims, taking them in an order that roughly parallels the proceedings below.

### A.  <u>Statute of Limitations</u>.

Lugo challenges the timeliness of his prosecution, insisting that his initial period of participation in the conspiracy — which ran from late 2006 to early 2007 — is beyond the applicable five-year statute of limitations.  <u>See</u> 18 U.S.C. § 3282.  Since Lugo raises this argument for the first time on appeal, our review would normally be for plain error.  <u>See</u> <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 731-32 (1993).  Here, however, precedent precludes any review at all.

The Supreme Court recently has held that a defendant can never successfully pursue a statute-of-limitations defense for the first time on appeal.  <u>See</u> <u>Musacchio</u> v. <u>United States</u>, 136 S. Ct. 709, 716-18 (2016).  The Court reasoned that the statute of limitations becomes part of a case only if the defendant raises it as a defense in the district court.  <u>See</u> <u>id.</u> at 717-18.  If the defendant fails to do so, the limitations defense never "become[s] part of the case and the Government does not otherwise have the burden of proving that it filed a timely indictment."  <u>Id.</u> at 718.

- 7 -

In such circumstances, a district court's failure to consider the timeliness of the charge can never be error.  See id.

So it is here.  Lugo did not question the timeliness of his prosecution below.  Thus, the district court's failure to consider that issue was not error.  See id.

### B.  **English Proficiency Requirement**.

Both Walker and Lugo challenge the constitutionality of the requirement, as applied in the District of Puerto Rico, that jurors be proficient in English.  The requirement itself is statutory in nature: Congress has provided that jurors who serve in federal court trials must be able to read, write, and understand English with at least minimal proficiency.  See 28 U.S.C. § 1865(b)(2)-(3).  The defendants argue that, when applied in Puerto Rico (where Spanish speakers predominate), this requirement abridges the defendants' right to a trial by a jury comprising a fair cross-section of the community.  See Duren v. Missouri, 439 U.S. 357, 360 (1979); Taylor v. Louisiana, 419 U.S. 522, 526-27 (1975).

This claim was not advanced below, and it is subject to plain error review.  See United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

The English proficiency requirement, on its face, puts in place a sensible modality for the conduct of trials in federal courts.  Not surprisingly, this requirement has survived a steady

stream of attacks in this circuit.  See, e.g., United States v. De La Paz-Rentas, 613 F.3d 18, 24 (1st Cir. 2010); United States v. Escobar-de Jesus, 187 F.3d 148, 166 (1st Cir. 1999); United States v. Flores-Rivera, 56 F.3d 319, 326 (1st Cir. 1995).  These decisions bring into play the law of the circuit doctrine, which confirms that, in a multi-panel circuit, a new panel is "bound by prior panel decisions that are closely on point."  San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010).

Only a handful of narrow exceptions to this doctrine exist.  These exceptions include "the occurrence of a controlling intervening event (e.g., a Supreme Court opinion on the point; a ruling of the circuit, sitting en banc; or a statutory overruling) or, in extremely rare circumstances, where non-controlling but persuasive case law suggests" departing from prior precedent.  United States v. Chhien, 266 F.3d 1, 11 (1st Cir. 2001).  No such exception pertains here.  It follows inexorably as sunset follows sunrise, that we must reject the defendants' belated challenge to the English proficiency requirement.

### C.  **Admission of Traffic-Stop Evidence**.

Walker argues that the district court erred when it permitted the government to introduce evidence seized during a July 2008 traffic stop.  The relevant facts can be succinctly summarized.  Puerto Rico police officers came across Walker's car while on patrol.  They observed that the license plate was

partially obscured (in violation of local traffic laws) and stopped the car so that they could investigate the putative violation. During the ensuing stop, the officers obtained Walker's consent to a search of the vehicle. In the course of that search, the officers found cash, a loaded gun, a small bag of marijuana cuttings, and a marijuana cigar.

At trial, Walker for the first time questioned the propriety of the traffic stop and sought suppression of the evidence seized. He insisted that the officers were interested in his car because they suspected his involvement in a criminal organization then under investigation and that their traffic-violation rationale was pretextual. The district court denied the motion to suppress on the merits and allowed the government to introduce the disputed evidence.

In this venue, Walker attempts to raise a variety of more particularized challenges to the warrantless stop. He argues, for example, that the government did not have reasonable suspicion adequate to justify the stop, see Chhien, 266 F.3d at 5-6, and that the evidence was seized in violation of the Fourth Amendment, see Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). He alleges that his license plate was fully legible, and that the officers had only a "generalized suspicion" that he was involved in criminal activities. See United States v. Cortez, 449 U.S. 411, 417-18 (1981) (requiring a "particularized and objective

- 10 -

basis" to justify a traffic stop).  Moreover, he suggests that even if the initial stop was lawful, it was impermissibly prolonged.  See Rodriguez v. United States, 135 S. Ct. 1609, 1611 (2015).

We need not reach the merits of Walker's argument.  The critical datum is that he did not move to suppress the evidence seized until his trial was already well underway.  That delay is fatal to the challenge that he now seeks to pursue.

Walker's claim of error is governed by the version of the rule that was in effect when the district court adjudicated his motion.  See United States v. Bulger, 816 F.3d 137, 145 n.7 (1st Cir.), cert. denied, 137 S. Ct. 247 (2016).  Federal Rule of Criminal Procedure 12 was amended in December of 2014.  The pre-amendment version of the rule, as it read at the time of Walker's trial, specified that the failure to move to suppress particular evidence before trial resulted in "waiver" of any objection and that such a waiver should be overlooked only upon a showing of "good cause" sufficient to excuse the delay.  See Fed. R. Crim. P. 12(e) (2014 ed.).  Walker wholly failed to identify any semblance of good cause that might have excused the untimeliness of his motion to suppress.  Thus, Walker's suppression claim was waived — and having waived it, Walker is not entitled to any appellate

review.[1]  See United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002) (explaining that "a waived issue ordinarily cannot be resurrected on appeal").

Contrary to Walker's importunings, the fact that the district court elected to deny his motion on the merits does not alter our analysis.  That a district court chooses to address a motion on the merits does not preclude an appellate court from ruling that the motion should have been denied on a procedural ground (such as waiver or preclusion).  See United States v. Bashorun, 225 F.3d 9, 14 (1st Cir. 2000).  As we have noted, a trial court may opt to address a waived claim simply to create a record in the event that the appellate court does not deem the argument waived.  See, e.g., United States v. Santos Batista, 239 F.3d 16, 20 (1st Cir. 2001).

## D.  **Summation**.

The defendants attack several statements made by the prosecutor during closing argument.  They strive to convince us that the statements were so improper and prejudicial as to demand a new trial.  We are not persuaded.

---

[1] We hasten to add that even under the current version of Rule 12, Walker would not be entitled to any relief.  Though the express reference to "waiver" in Rule 12 was deleted in December of 2014, the amendment did not substantively change the rule.  See Fed. R. Crim. P. 12 advisory committee's notes to 2014 amendments (stating that "[n]ew paragraph 12(c)(3) retains the existing standard for untimely claims").

When, as in this case, a defendant does not contemporaneously object to a statement made during closing argument, review is for plain error.  See Sepulveda, 15 F.3d at 1188.  That review "entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Duarte, 246 F.3d at 60.

We have made it pellucid that, as applied to closing arguments, the plain error standard requires the court first to determine whether the challenged comment is obviously improper, that is, whether the first two prongs of the plain error standard have been satisfied.  See United States v. Vizcarrondo-Casanova, 763 F.3d 89, 96-97 (1st Cir. 2014); United States v. Nunez, 146 F.3d 36, 39 (1st Cir. 1998).  If so, the court must proceed to consider whether the comment "so poisoned the well that the trial's outcome was likely affected."  United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987).  In conducting this assessment, the court must weigh factors such as the severity of the misconduct, the context in which it occurred, the presence or absence of curative instructions, and the strength of the evidence.  See United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011).

The defendants first complain that the prosecutor went astray when he said, without objection:

> [W]e could have easily . . . taken this trial and turned it into two months. Easily. Could have brought in boatloads of seizures, showing you every video in the world.
>
> The question is, does that change what the evidence showed? Does bringing boatloads of cocaine really change what was proven? We argue no.

The defendants contend that this statement amounted to an improper reference to extra-record evidence. See, e.g., United States v. Tajeddini, 996 F.2d 1278, 1284 (1st Cir. 1993).

It is elementary that cases should be tried and decided based on the evidence before the jury, see Smith v. Phillips, 455 U.S. 209, 217 (1982), and the government crossed the line into forbidden terrain when it cavalierly told the jury that "boatloads" of other evidence, never introduced, inculpated the defendants.[2]

Even so, the possibility that the prosecutor's statement affected the outcome of the trial is miniscule. The copious trial

---

[2] Regrettably, this is not the first time that federal prosecutors in Puerto Rico have jeopardized strong cases by making overzealous arguments. See, e.g., United States v. Pereira, 848 F.3d 17, 33 (1st Cir. 2017); United States v. Ayala-García, 574 F.3d 5, 22 (1st Cir. 2009); United States v. Andújar-Basco, 488 F.3d 549, 561 & n.5 (1st Cir. 2007); see also United States v. Martínez-Medina, 279 F.3d 105, 128 & n.12 (1st Cir. 2002) (Torruella, J., concurring) (collecting cases). Issues of this sort have arisen both when prosecutors are hired locally in the first instance and when they have transferred from another district, implying a lack of both training and oversight. It is as much a part of a prosecutor's sworn duty to abide by the rules governing criminal proceedings as it is to prosecute cases. We hope that the Department of Justice will at long last begin to take seriously these persistent derelictions of duty.

evidence provided overwhelming proof of the defendants' guilt. It is a commonsense proposition that "the well is . . . less likely to have been poisoned where strong evidence supports the prosecutor's case." Kasenge, 660 F.3d at 543. As we illustrate below, that proposition applies here.

With respect to Walker, no fewer than three witnesses testified in detail about his involvement in the conspiracy. One identified him as a runner and pusher at the El Coral housing project who sold cocaine, crack cocaine, and marijuana. A second confirmed that Walker served as a runner and explained that she, too, had seen him sell cocaine, crack cocaine, and marijuana at El Coral on several occasions. The third (a self-confessed pusher in the drug ring) testified that Walker provided him with cocaine to sell. All three witnesses testified that Walker carried a gun while distributing drugs, and one witness confirmed that the gun carried by Walker was the same color and type as the gun seized from Walker's car during the July 2008 traffic stop. In addition, a police officer testified that when Walker was arrested in September of 2010, he was carrying 25 vials of crack cocaine.

So, too, equally robust evidence supported Lugo's conviction. A government witness testified that Lugo sold him marijuana several times a week between 2006 and 2007. The same witness testified that he had seen Lugo sell cocaine, crack cocaine, and marijuana to others in the housing project. Further,

the witness explained that he and Lugo would sometimes smoke marijuana together and give each other advice about selling drugs and evading law enforcement.

To make the cheese more binding, the government introduced a number of surveillance videos. Construing the videos in the light most favorable to the verdict, see Sepulveda, 15 F.3d at 1172, the footage depicted Lugo selling drugs at the El Faro housing project. In them, Lugo is seen exchanging money and parcels with a number of people. Government witnesses identified the individuals seen working with Lugo in the videos as fellow members of the conspiracy.

One other point deserves special mention. Although the defendants did not request a curative instruction specifically addressing the prosecutor's improper "boatloads" reference and the district court did not give one, the court did instruct the jurors (after the closing arguments had been completed) that their verdict must be based solely on the evidence. The court added that "[a]rguments and statements by lawyers are not evidence." These instructions mitigated any adverse impact that the improper statement might otherwise have had. See Mejia-Lozano, 829 F.2d at 274. Given these instructions and the strength of the government's case, we are confident that the "boatloads" statement, though far beyond the pale, did not affect the verdict and, thus, did not deprive the defendants of a fair trial.

Walker challenges several other statements made during the prosecutor's summation. For example, he alleges that the prosecutor engaged in improper vouching. Once again, further facts are needed to put this allegation in context.

Throughout the trial, Walker's counsel attempted to discredit government witnesses by eliciting testimony that they had agreed to cooperate in exchange for leniency at sentencing. During summation, the prosecutor — attempting to combat this line of attack — noted that two of the government's three cooperating witnesses had testified that they were concerned that helping the government could put them at risk of retaliation. The prosecutor asked the jurors whether it would make sense to testify "and risk their lives to what, save a couple of years?" It is this statement that Walker insists amounted to vouching.

Vouching occurs when a prosecutor "places the prestige of her office behind the government's case by, say, imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted." United States v. Perez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003). Here, the prosecutor did not mention his personal beliefs about the witnesses' veracity, nor did he imply that the witnesses should be trusted simply because they testified on the government's behalf. Instead, he referred to trial testimony in an effort to give the jurors a reason why they should

- 17 -

credit the witnesses' testimony. "[A]n argument that does no more than assert reasons why a witness ought to be accepted as truthful by the jury is not improper witness vouching." Id. at 10 (quoting United States v. Rodríguez, 215 F.3d 110, 123 (1st Cir. 2000)).

Next, Walker (who did not testify on his own behalf) asserts that the prosecutor commented on his silence, in violation of the Fifth Amendment. See Griffin v. California, 380 U.S. 609, 615 (1965). This assertion rests on a grab-bag of statements uttered during the prosecutor's summation:

- at one point, the prosecutor stated that "the [witnesses'] identification of the defendants in this case is not challenged";

- at another point, the prosecutor noted that defense counsel had not argued that the government's witnesses did not know the defendant;

- at yet another point, the prosecutor observed that defense counsel had not identified any credible reason why the government's witnesses would have lied.

Walker's contention that these statements amounted to comments on his failure to testify is made up out of whole cloth. When a defendant maintains that the prosecutor commented on his silence, the central question reduces to "whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would

naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Laboy-Delgado, 84 F.3d 22, 31 (1st Cir. 1996) (quoting United States v. Lilly, 983 F.2d 300, 307 (1st Cir. 1992)). Here, the prosecutor did no more than point out to the jury that defense counsel had not made certain arguments. Taken in context, no reasonable juror could interpret the prosecutor's statements as even veiled commentary on Walker's decision not to testify. See id.

Walker finds fault with yet another aspect of the prosecutor's summation. He insists that the prosecutor referred to facts not in evidence when he stated that Walker "went and got another [gun]" after police officers, during the July 2008 traffic stop, seized the gun that had been in his car. As Walker sees it, "[t]here was no trial evidence supporting the prosecutor's statement."

The record tells a different tale. One of the government's witnesses, testifying about conduct that occurred after 2008, vouchsafed that she regularly saw Walker with a firearm. There was no evidence that the seized gun was ever returned to Walker, so it was a reasonable inference that any gun carried by Walker after 2008 was not the gun seized by the police in 2008. Thus, the challenged statement had an adequate basis in the evidence and, therefore, was not improper. See United States v. Hernández, 218 F.3d 58, 68 (1st Cir. 2000) (explaining that

"[p]rosecutors are free to ask the jury to make reasonable inferences from the evidence submitted at trial").

## E. **Jury Instructions**.

Lugo advances a claim of instructional error.[3] This claim centers on a statement that the district court made in its end-of-case jury instructions. Some background facts are needed to place this claim in perspective.

At the close of the government's case-in-chief, the court concluded that there was insufficient evidence to support the charge against Lugo for aiding and abetting the distribution of heroin. Accordingly, it granted Lugo's Rule 29(a) motion for judgment of acquittal on that count. In its end-of-the-case jury instructions, the court told the jury that the court had "dismissed that charge" after determining that "the proof did not find sufficiency."

Before us, Lugo argues for the first time that the court's statement necessarily implied that there was sufficient evidence to support a verdict for the government on the remaining counts. In his view, the statement implicitly diminished the government's burden of proof on those counts. Because he did not object to the jury instructions when they were given, his claim is

---

[3] Lugo makes a second claim of instructional error which, for simplicity's sake, we discuss in connection with his arguments relating to the scope of the conspiracy. See infra Part II(F).

reviewed for plain error.  See United States v. Pennue, 770 F.3d 985, 989 (1st Cir. 2014).

The "plain error hurdle . . . nowhere looms larger than in the context of alleged instructional errors." United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001).  Thus, Lugo's claim faces a steep uphill climb.  See id.  Lugo tries to make this climb by arguing that any reasonable juror would have understood the court to mean that, if there was insufficient evidence to convict Lugo on the heroin charge, there must have been sufficient evidence on the other counts.  This argument is too facile by half.  For one thing, it ignores the very real possibility that the jurors would have understood the court to mean nothing more than that there was insufficient evidence to submit the heroin charge for their consideration.  For another thing, the argument ignores the equally real possibility that the jurors would have taken the statement to indicate that the government had overreached, disposing the jurors to examine the remaining counts more skeptically.

The short of it is that the challenged statement is ambiguous.  When a prosecutor makes an ambiguous remark, a reviewing court "should not lightly infer that [the] prosecutor intend[ed the] remark to have its most damaging meaning or that a jury . . . will draw that meaning from the plethora of less damaging interpretations." Donnelly v. DeChristoforo, 416 U.S. 637, 647

(1974).  We think that situation is analogous to the situation at hand, and "[w]e are particularly unwilling to fish in the pool of ambiguity where the defendant[] did not contemporaneously object." Sepulveda, 15 F.3d at 1188.

We hold that where, as here, an instruction is ambiguous and is not objected to in a timely manner, a reviewing court should hesitate to give the instruction its most pernicious meaning.  In this instance, a context-specific review satisfies us that the challenged statement, viewed under the totality of the circumstances, has not affected the trial's fairness.  Cf. id. at 1187 (warning against deciding cases "on what amounts to a doomsday scenario").  There was no plain error.[4]

**F.  Scope of the Conspiracy.**

Lugo challenges the sufficiency of the evidence underlying his conspiracy conviction.  Specifically, he assigns error to the district court's denial of his post-trial motion for judgment of acquittal on the ground that the government did not prove the existence of a single mega-conspiracy.  In his view, the totality of the evidence indicated no more than that he participated in a mini-conspiracy operated out of one housing

_____

[4] After Walker filed his opening brief, he attempted for the first time to incorporate Lugo's claim of instructional error by motion.  See Fed. R. App. P. 28(i).  We need not decide whether Walker's belated attempt at incorporation suffices because, in any event, the attempt fails for the same reasons that Lugo's claim fails.

project, not in a broader conspiracy covering all three housing projects. Since this issue was preserved below, we review the denial of his Rule 29(c) motion de novo. See United States v. George, 841 F.3d 55, 61 (1st Cir. 2016). The pivotal question is "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." Id. (quoting United States v. Chiaradio, 684 F.3d 265, 281 (1st Cir. 2012)).

Our assessment of whether the evidence supports a finding of a single conspiracy must be "pragmatic" in nature. United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004). We consider, among other things, whether a rational jury could have found that the coconspirators had a common goal, were interdependent, and had overlapping roles. See id.; United States v. Portela, 167 F.3d 687, 695-96 (1st Cir. 1999). We conclude, without serious question, that a rational factfinder could have determined not only that Oppenheimer conducted drug-trafficking operations in three public housing projects but also that all of these operations were part of one mega-conspiracy.

To begin, the evidence supported a reasonable inference that all of the individuals that worked under Oppenheimer (including Lugo) shared a common goal: "furthering the

distribution of drugs."  United States v. Negrón-Sostre, 790 F.3d 295, 309 (1st Cir. 2015).  The record includes detailed information about the methods that the coconspirators employed to acquire drug inventory, protect that inventory, and distribute contraband in their communities.  Similarly, there was evidence that the coconspirators often discussed their sales and pooled information about how to evade detection.  No more was exigible to ground a finding that Oppenheimer's cohorts were working toward a common goal.  See Portela, 167 F.3d at 695-96.

A rational jury also could have found that the participants were interdependent.  Such a finding requires evidence from which a jury reasonably could conclude that "the activities of one aspect of the scheme [were] necessary or advantageous to the success of another aspect of the scheme."  Id. at 695 (citation omitted).  The evidence demonstrated that Oppenheimer headed up a finely tuned drug-distribution enterprise. He worked with several confederates to package drugs for sale in the three housing projects.  Runners working in each project would then deliver allotments of drugs to pushers for sale at retail. The pushers (including Lugo) worked in ten to twelve hour shifts — at the El Coral and Lagos de Blasina projects, the shifts ran through the night, seven days a week.  El Faro, however, was open for business every day from 6:00 a.m. to midnight.  At the end of his shift, each pusher would turn his proceeds over to a runner,

who would make certain that the money reached Oppenheimer. Because each coconspirator's success "depend[ed] on the continued existence and health of the drug distribution organization as a whole," the jury safely could conclude that coconspirators across projects were interdependent. United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009).

Last — but not least — the evidence supported a finding that the participants overlapped. Such a finding does not require a showing that every coconspirator knew his fellow coconspirators. See United States v. Soto-Beníquez, 356 F.3d 1, 19 (1st Cir. 2003) (explaining that "government need not show that each conspirator knew of or had contact with all other members," to prove existence of only one conspiracy). Nor does it require a showing that the same individuals were involved for the duration of the conspiracy. See id. Showing that the enterprise revolved around a single, identified core coconspirator is often sufficient. See Portela, 167 F.3d at 695.

In this case, the government's proof showed a classic hub-and-spokes conspiracy, with Oppenheimer as the hub. In particular, the evidence made pellucid Oppenheimer's pervasive involvement as the core coconspirator.[5] See id. Furthermore,

_____

[5] Lugo's brief on appeal admits as much. It states, "the evidence at trial established that various drugs were sold at three separate housing projects in Carolina, Puerto Rico. David

- 25 -

Oppenheimer was not the only person with ties to each project. The trial testimony identified several persons who worked closely with him at a central location to package drugs for sale at all three housing projects. Some coconspirators discussed their shift schedules and sales volume with coconspirators who worked principally (or exclusively) at other projects. It was common knowledge among the members of the drug ring that profits from sales at all three locations increased the take for Oppenheimer and his inner circle.

In an effort to blunt the force of this reasoning, Lugo submits that the evidence cannot support a finding that he was part of a single mega-conspiracy because there was no evidence that he personally sold drugs in two of the three housing projects. The fact that he did not sell drugs at all three sites does not take Lugo very far. A defendant need not be personally involved in all of a conspiracy's activities in order to be held criminally responsible for the conspiracy's wrongdoing. See Soto-Beníquez, 356 F.3d at 19; United States v. Baines, 812 F.2d 41, 42 (1st Cir. 1987) ("[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and [he] assumes conspirator's responsibility for the existing freight — or conduct — regardless of whether he is aware of just what it is composed.").

Oppenheimer was in control of the drug activity at all three projects."

- 26 -

That ends this aspect of the matter.  The evidence, viewed in the light most favorable to the verdict, amply supports the jury's determination that Oppenheimer ran — and Lugo participated in — a single mega-conspiracy.  See Sepulveda, 15 F.3d at 1172.

Lugo soldiers on.  Although his primary argument is framed as a challenge to the sufficiency of the evidence, he suggests in passing that the evidence varied from the indictment (which charged him with participation in a single conspiracy).  We quickly dispose of this suggestion.

"A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment."  United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009) (quoting United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008)).  To the extent that Lugo attempts to identify a variance between the indictment and the trial evidence, he has failed to offer any developed argumentation on a keystone issue: "[a] variance is grounds for reversal only if it is prejudicial, that is, if it affects the defendant's 'substantial rights.'"  Id. (quoting United States v. DiCicco, 439 F.3d 36, 47 (1st Cir. 2006).  Because Lugo makes no such argument here, any claim of variance is waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (observing that

"issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Lugo has one further shot in his sling. He assails the district court's failure to give the jury a multiple-conspiracy instruction explicitly describing the difference between a single conspiracy and multiple conspiracies, including "specific factors that [the jury] could consider" in making such a determination. In the court below, Lugo did not request such an instruction. Accordingly, our review is for plain error. See United States v. Stierhoff, 549 F.3d 19, 25 (1st Cir. 2008).

A multiple-conspiracy instruction is warranted "if, on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged." Niemi, 579 F.3d at 126 (quoting United States v. Balthazard, 360 F.3d 309, 315 (1st Cir. 2004)). To make out plain error, a defendant must show, among other things, that the omission affected his substantial rights. See United States v. Thomas, 895 F.2d 51, 55 (1st Cir. 1990).

Here, however, the evidence supported the jury's single-conspiracy finding, and Lugo has not explained how the absence of a multiple-conspiracy instruction affected his substantial rights. Nor can he make such a showing: the district court instructed the jury that the government bore the burden of proving "that the agreement specified in the indictment, and not some other agreement

or agreements, existed between at least two people" and "that the defendants willfully joined in that agreement." These instructions made pellucid that the government had to prove not only that an overall conspiracy existed but also that Lugo was a part of it. If the jurors entertained any reasonable doubt that Lugo was a part of the conspiracy charged, the instructions told them that they must acquit. These clearly articulated instructions protected Lugo from any prejudice. See, e.g., Mangual-Santiago, 562 F.3d at 424-25 (finding, in nearly identical circumstances, that court's failure to give more particularized multiple-conspiracy instruction did not prejudice defendant); Niemi, 579 F.3d at 126-27 (similar); Balthazard, 360 F.3d at 315-16 (similar). We conclude, therefore, that the absence of a multiple-conspiracy instruction did not amount to plain error.

## III.  CLAIMS OF SENTENCING ERROR

We next address the defendants' claims of sentencing error. When a defendant raises both procedural and substantive claims of sentencing error, we first address those claims that allege procedural infirmities. See United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008). We then address any arguments relating to substantive reasonableness. See id.

### A.  Walker.

Walker claims that the district court engaged in improper factfinding when it calculated the drug quantities

attributable to him for sentencing purposes. These claims are twofold. First, he says that the sentencing court had no business finding facts at all, since such factfinding is the exclusive province of the jury. Second, he asserts that any judicial factfinding at sentencing should have been supported by clear and convincing evidence. We review these unpreserved claims for plain error. See Duarte, 246 F.3d at 60.

At a criminal trial, the government bears the burden of proving beyond a reasonable doubt any drug quantity charged in the indictment as an element of the offense. See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013); United States v. Dunston, 851 F.3d 91, 101 (1st Cir. 2017). In a conspiracy case, though, a drug quantity charged in the indictment, found by the jury, and described in the verdict is generally attributable to the conspiracy as a whole. See United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004). Quantities so found serve only to establish the applicable statutory minimum and maximum sentences. See Alleyne, 133 S. Ct. at 2155; Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).

This framework is augmented at sentencing. Because "a defendant-specific determination of drug quantity [i]s a benchmark for individualized sentencing under the guidelines," Dunston, 851 F.3d at 101 (alteration in original) (quoting Colón-Solís, 354 F.3d at 103), the sentencing court must conduct additional

factfinding to determine the drug quantities "attributable to[] or reasonably foreseeable by" a particular defendant, United States v. Cintrón-Echautegui, 604 F.3d 1, 5 (1st Cir. 2010). The sentencing court's interstitial findings are bounded by the floor and ceiling previously set by the jury's verdict, and they need only be supported by a preponderance of the evidence. See id. at 6.

At Walker's disposition hearing, the district court, using a preponderance-of-the-evidence metric, found him responsible for the equivalent of 12,885.56 kilograms of marijuana. Walker maintains that this factfinding runs afoul of both Alleyne and Apprendi. Walker is wrong.

We have said before — and today reaffirm — that "[n]o . . . error occurs when a defendant's sentence is based . . . on Guidelines considerations without changing the applicable mandatory minimum" or maximum sentence. United States v. Ramírez-Negrón, 751 F.3d 42, 49 (1st Cir. 2014). Although any fact that changes the applicable minimum or maximum sentence must be submitted to a jury, this "does not mean that any fact that influences judicial discretion must be found by a jury." Alleyne, 133 S. Ct. at 2163. Thus, the court below did not err when it exercised its discretion to find facts needed to inform its sentencing decision. See id.

Walker's contention that the judicial factfinding should have been supported by clear and convincing evidence, rather than by preponderant evidence, is insupportable.  We have repeatedly — and recently — upheld the use of the preponderance standard at sentencing.  See, e.g., United States v. Munyenyezi, 781 F.3d 532, 544 (1st Cir.), cert. denied, 136 S. Ct. 214 (2015).  Walker offers nothing that would warrant a departure from this solid phalanx of circuit precedent.  Consequently, we apply the settled law of this circuit and reject his claims of sentencing error.

### B.  Lugo.

Lugo challenges the district court's decision to hold him responsible for what amounted to 1,328.41 kilograms of marijuana.[6]  Before addressing his particular claims, we survey the district court's methodology.

At sentencing, the court made a series of findings to help determine the drug amounts attributable to Lugo.  First, it concluded that Lugo participated in the conspiracy for a total of 267 days.  Next, it calculated the average amount of cocaine, crack cocaine, and marijuana sold by the conspiracy in the course of a typical day.  The court then divided each figure by three to

---

[6] Additionally, Lugo attempts to incorporate Walker's claims of sentencing error by reference.  See Fed. R. App. P. 28(i).  To the extent that his perfunctory effort at incorporation suffices — a matter on which we take no view — that attempt fails for the same reasons that Walker's claims fail.

approximate the amount of drugs sold daily at the El Faro housing project (where Lugo worked). Finally, the court multiplied the resulting values by 267 to approximate the amount of drugs that Lugo sold during his periods of active participation in the conspiracy.[7]

Lugo takes issue with several of these steps. First, he questions the court's decision to hold him accountable for 267 days of conspiracy participation. Because Lugo raised this argument below, we review the court's fact-based determination for clear error. See Dunston, 851 F.3d at 101. Under this deferential standard, the court's determination must stand unless, "after assessing the whole of the record, [we are] firmly convinced that a mistake has been made." Id.

The court arrived at its 267-day figure after reviewing trial testimony and concluding that Lugo participated in the Oppenheimer drug ring from October of 2006 to March of 2007 and from January of 2011 through April of 2011. The record supports this determination. At least one witness testified that he regularly purchased marijuana from Lugo in "2006 up to the beginning of 2007." The same witness testified that he observed Lugo selling both cocaine and crack cocaine in 2007. In addition,

---

[7] Before arriving at a total drug quantity, the court converted the drug amounts for cocaine and crack cocaine to their marijuana equivalents and added them to the drug amount for marijuana. See USSG §2D1.1, cmt. n.8(B), (D).

videotapes showed Lugo selling drugs in January, February, and April of 2011.

Drug quantity determinations do not have to be exact. See United States v. Platte, 577 F.3d 387, 392 (1st Cir. 2009); United States v. Rivera-Maldonado, 194 F.3d 224, 228 (1st Cir. 1999). In this context, "a reasoned estimate will suffice." United States v. Rodríguez, 731 F.3d 20, 30-31 (1st Cir. 2013) (quoting United States v. Laboy, 351 F.3d 578, 584 (1st Cir. 2003)). Just as a sentencing court may estimate drug quantity, so, too, it may make reasonable estimates regarding subsidiary facts (such as the frequency or duration of a defendant's participation in the criminal activity). See Cintrón-Echautegui, 604 F.3d at 7. The evidence here furnished sufficient support for the court's determination of the duration of Lugo's involvement. While the witnesses did not use precise dates, the court's estimate was adequately rooted in the evidence. Drug dealers do not punch time cards, and a sentencing court must be given some latitude to extrapolate duration from anecdotal evidence. See Rodríguez, 731 F.3d at 31-32; United States v. Marquez, 699 F.3d 556, 561 (1st Cir. 2012).

Lugo also asserts that the district court erred when it did not credit his claim that he sold drugs only "one to two" times per week. This claim, however, misses the mark. Where, as here, a defendant has been convicted as a coconspirator, his relevant

- 34 -

conduct for sentencing purposes "includes not only his own acts and omissions but also the reasonably foreseeable acts and omissions of other coconspirators in furtherance of the conspiracy." Dunston, 851 F.3d at 101 (citing USSG §1B1.3(a)(1)(B)). It was surely foreseeable to Lugo that his coconspirators would continue to sell drugs at El Faro even on days when Lugo himself was not actively selling.

Battling on, Lugo challenges the sentencing court's decision to divide the drug sales attributable to the entire conspiracy by three as a means of calculating the sales reasonably attributable to the El Faro housing project. He insists that "[t]here was no testimony that the drug sales at El Faro were as high as those in the other housing projects." Given that evidentiary gap, he argues that the court erred when it divided the drug amounts evenly among the three projects.

One conspicuous fly in the ointment is that Lugo did not make this argument below. Consequently, our review is for plain error — and we discern none here. Lugo identifies no evidence compelling the conclusion that the drug sales at El Faro were less than the drug sales at either of the other projects. Given this dearth of evidence, we cannot say that the district court plainly erred in opting to attribute one-third of the gross sales to El Faro.

Lugo next suggests that the district court erred when it attributed 280 grams of crack cocaine to him. This suggestion, too, surfaces for the first time on appeal, so review is for plain error.

The sentencing court settled on the disputed figure because that figure represented the maximum amount for which the jury found Lugo responsible at trial. In Lugo's view, the court should have divided 280 grams by three, to account for the fact that the jury's figure represented drug sales at all three projects.[8]

Lugo's argument misconceives the method that the court used to calculate the amount of crack cocaine attributable to him. When the court performed its calculations, it used the same approach for crack cocaine that it used for the other drugs. In the end, this yielded a drug weight of 787 grams — more than the jury's 280-gram finding. With this in mind, the court found Lugo responsible for 280 grams of crack cocaine — a finding that both reflected the jury's verdict and avoided any conflict with the applicable statutory range framed by that verdict. See Alleyne,

---

[8] To be precise, the jury found Lugo responsible for aiding and abetting the distribution of "28 grams or more, but less than 280 grams" of crack cocaine. Thus, the court should have found Lugo responsible for no more than 279 grams of crack cocaine, not 280 grams. But Lugo has not briefed this issue, and the error was manifestly harmless because the one-gram discrepancy did not change Lugo's GSR.

133 S. Ct. at 2155; Apprendi, 530 U.S. at 490.  Seen in this light, there was no need to divide the 280-gram figure by three, and plain error is plainly absent.

Finally, Lugo makes veiled references to a claim of substantive unreasonableness and a claim that the district court was predisposed to impose a particular sentence.  Such references, without more, are not adequate to preserve those claims for appellate review.  See Zannino, 895 F.2d at 17.  As a result, we deem them abandoned.

## IV.  CONCLUSION

We need go no further.  For the reasons elucidated above, the judgments below are

**Affirmed**.