**UNITED STATES of America,
Appellee,**

v.

**Rafael VENTURA, Defendant,
Appellant.**

**No. 01–2448.**

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 2003.

Decided Dec. 2, 2003.

have been abandoned.

Robert Sugar, by appointment of the court, for appellant.

Peter K. Levitt, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for the United States.

Before SELYA, Circuit Judge, COFFIN and STAHL, Senior Circuit Judges.

SELYA, Circuit Judge.

In this sentencing appeal, defendant-appellant Rafael Ventura seeks to convince us that the district court committed a myriad of errors. His asseverational array requires us to consider, among other things, questions of first impression in this circuit regarding the interpretation and operation of the career offender guideline.[1] After close scrutiny, we find the appellant's arguments unpersuasive. Accordingly, we affirm the sentence imposed below.

## I.

### Background

A federal grand jury indicted the appellant and six other persons—Puggi Vasquez, Becky Alvarado, William Diaz, Leonardo Garcia, Wanda Justiniano, and Ramon Oliveras—on a motley of drug-trafficking charges. The umbrella count of the indictment alleged that from August 29 through October 28, 1998, in and around Worcester, Massachusetts, the seven defendants conspired to possess with intent to distribute sundry controlled substances, including at least 50 grams of crack cocaine. *See* 21 U.S.C. §§ 841(a)(1), 846; *see also id.* § 841(b)(1)(A)(iii) (establishing a ten-year mandatory minimum sentence for that drug quantity). The indictment also charged the appellant with eight substantive distribution counts, each occurring on a designated date.

The appellant initially maintained his innocence. On May 18, 2000, he reversed course and pleaded guilty to the nine aforementioned counts. He changed his plea pursuant to a written plea agreement (the Agreement), which, among other things, committed both parties to the proposition that the appellant was a career offender. *See* United States Sentencing Guidelines (USSG) § 4B1.1.

On September 26, 2001, the district court convened the disposition hearing. Arguments ensued concerning drug quantity, role in the offense, and the effect of the career offender designation. The court considered, inter alia, the presentence investigation report (PSI Report) and reports of the Drug Enforcement Administration (DEA) describing proffers attributed to certain coconspirators, namely,

1. The district court applied the November 1998 edition of the sentencing guidelines (the version in effect on the date of sentencing), and so do we. *See United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990).

Vasquez, Garcia, and Justiniano. The appellant did not offer any evidence and did not request an evidentiary hearing.

The district court resolved the drug-quantity and role-in-the-offense issues against the appellant. It proceeded to calculate a total offense level by (i) determining that the base offense level was 36, see USSG § 2D1.1(c)(2); (ii) elevating it by four levels because the appellant had functioned as an organizer or leader of a conspiracy that involved five or more participants, see id. § 3B1.1(a); and (iii) reducing it by three levels in consideration of the appellant's full and timely acceptance of responsibility, see id. § 3E1.1. Moving to the other side of the grid, the court noted the appellant's two prior felony convictions and ratified the parties' stipulation that he was a career offender. This decision led the court to eschew the appellant's wonted criminal history category (CHC)—category II—in favor of CHC VI. See id. § 4B1.1. That model yielded a guideline sentencing range (GSR) of 360 months to life imprisonment.

After granting the government's motion for a downward departure premised on the appellant's substantial assistance, see 18 U.S.C. § 3553(e); USSG § 5K1.1, the court imposed a 180–month incarcerative sentence, to be followed by five years of supervised release. This appeal ensued.

## II.

### Discussion

In this venue, the appellant raises essentially the same points that he unsuccessfully raised below (although his career offender argument is more nuanced). We address those contentions seriatim.

### A.

### Drug Quantity

■ Drug quantity is an important factor in establishing a defendant's base of-fense level. See United States v. Sepulveda, 15 F.3d 1161, 1196–97 (1st Cir.1993) ("In drug-trafficking cases under the sentencing guidelines, sentences are largely quantity-driven."). The appellant asseverates that the district court erred in assaying the amount of drugs for which he should be held accountable. We do not agree.

■ In determining drug quantity, the sentencing court's task is to make a reasonable approximation of the weight of the controlled substances for which a particular defendant should be held responsible. USSG § 2D1.1, cmt. (n.12). The court of appeals reviews the sentencing court's factual findings anent drug quantity only for clear error. United States v. Huddleston, 194 F.3d 214, 223 (1st Cir. 1999). In applying that standard to a drug-quantity determination made after a plea of guilty, we glean the facts from the change-of-plea colloquy, the undisputed portions of the PSI Report, and the transcript of the disposition hearing (including any proffers accepted by the court). United States v. Brewster, 127 F.3d 22, 24 (1st Cir.1997).

■ For sentencing purposes, quantities of diverse drugs are translated into marijuana equivalents. USSG § 2D1.1. The district court held the appellant responsible for a total of 244.53 grams of heroin, 871.9 grams of crack cocaine, and 827.8 grams of powdered cocaine. Using the appropriate conversion formula, this translated into the equivalent of 17,848 kilograms of marijuana. The appellant asserts that this total vastly overstates the true facts. The record does not bear out the appellant's assertion.

By means of his guilty plea, the appellant admitted to specific transactions involving 44.53 grams of heroin, 71.9 grams

of cocaine base (crack cocaine), and 27.8 grams of cocaine powder—representing the sum total of drugs purveyed in six surveilled transactions. The appellant concedes that these amounts were properly attributed to him. He trains his fire, however, on the district court's finding that he was responsible for incremental drug quantities, including 200 grams of heroin, 800 grams of crack cocaine, and 800 grams of powdered cocaine. The district court premised these incremental amounts largely on the proffers of the appellant's cohorts.

In our view, those proffers comprise a satisfactory basis for the attribution of the added amounts. One coconspirator (Vasquez) placed the appellant at the head of the drug distribution network that operated out of 21½ Washburn Street and used 160 Lovell Street as a stash house. Vasquez stated that the appellant took delivery of 200–250 grams of powdered cocaine twice weekly and 50–100 grams of heroin weekly. He also confirmed that the ring converted approximately half of the powdered cocaine into crack. Vasquez provided considerable detail, recounting his observations of numerous deliveries made by the appellant's principal supplier and identifying some of the appellant's regular customers. Two other codefendants, Garcia and Justiniano, had worked for the appellant. They described their duties and alluded to the significant amounts of drugs involved. Moreover, Justiniano named another of the appellant's suppliers. Last—but far from least—on October 29, 1998, the authorities confiscated 54.7 grams of heroin, 35.3 grams of cocaine base, and 6.73 grams of cocaine powder following a warrant-backed search of the stash house. The district court drew on this historical

evidence in making its aggregate drug-quantity determination.

■■ We discern no error. Findings as to drug quantity need not be precise to the point of pedantry. Such findings may be based on approximations drawn from historical evidence as long as those approximations represent reasoned estimates of drug quantity. *See Huddleston*, 194 F.3d at 224; *United States v. Rodriguez*, 162 F.3d 135, 149 (1st Cir.1998); *United States v. Morillo*, 8 F.3d 864, 871 (1st Cir.1993). The estimates need not be proven beyond a reasonable doubt, but, rather, may stand if they are supported by a fair preponderance of the evidence. *See United States v. Nieves*, 322 F.3d 51, 54 (1st Cir.2003).

■ In this instance, the proffers of the three coconspirators were consistent and mutually reinforcing. Their statements were bolstered by the contraband seized during the search of the stash house. Under the circumstances of this case—in which the appellant offered no contrary proof and eschewed any request for an evidentiary hearing on the issue of drug weight—we think that the lower court acted within its proper province in finding the proffer statements reliable. *See, e.g., Rodriguez*, 162 F.3d at 150; *United States v. Whiting*, 28 F.3d 1296, 1305 (1st Cir.1994); *see also United States v. Tardiff*, 969 F.2d 1283, 1287 (1st Cir.1992) (explaining that "the sentencing court has broad discretion to determine what data is, or is not, sufficiently dependable to be used in imposing sentence").

The appellant's other quantity-related challenges do not merit discussion. In the last analysis, the district court's drug-quantity determination was amply supported by the proffers and, in the bargain, provided a sizable margin for error.[2]

2. As said, the sentencing court found the appellant responsible for the equivalent of 17,- 848 kilograms of marijuana. Given a CHC of VI, a finding that the appellant was accounta-

Thus, the conclusion is irresistible that the district court did not clearly err in calculating the total drug weight attributable to the appellant.

## B.

### Role in the Offense

The appellant next challenges the sentencing court's determination that he was an organizer or leader of an extensive criminal activity—a determination that resulted in a four-level upward adjustment. This challenge lacks force.

The sentencing guidelines provide for a four-level enhancement for one who functions as an organizer or leader of an enterprise that either involves five or more persons or is otherwise extensive. USSG § 3B1.1(a). Although the guidelines do not explicitly define "organizer" or "leader," the Sentencing Commission has identified several factors that tend to distinguish top-echelon participants. *See United States v. Tejada–Beltran,* 50 F.3d 105, 110 (1st Cir.1995); *United States v. Talladino,* 38 F.3d 1255, 1260 (1st Cir.1994); *see also* USSG § 3B1.1, cmt. (n.4) (enumerating factors such as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others"). We review the district court's determination that the appellant was an organizer or leader for clear error. *See United States v. Graciani,* 61 F.3d 70, 75 (1st Cir.1995). Such inquiries are notoriously factbound, and struggles over a defendant's role in the offense "will almost always be won or lost in the district court." *Id.*

■■■ So it is here. The sentencing court termed the role-in-the-offense determination "a fairly easy call." The court incorporated by reference in its findings excerpts from the PSI Report. These excerpts strongly suggest that the appellant directed the activities of Vasquez, Garcia, Justiniano, and Alvarado, among others. The record bears out that the appellant orchestrated the ring, controlled the flow of drugs in its sphere of influence, handled most of the negotiations for amounts and prices, gave orders to the other six coconspirators, and oversaw the stash house. To cinch matters, several of the coconspirators identified the appellant as the boss. That characterization is itself highly probative. *See United States v. Piccolo,* 282 F.3d 41, 43 (1st Cir.2002) (rejecting defendant's claim he was not a leader based, in part, on the fact that three of the coconspirators identified him as their leader); *United States v. Caba,* 241 F.3d 98, 102–03 (1st Cir.2001) (upholding enhancement based, in part, on coconspirator's reference to the defendant as "the big"). No more was exigible to sustain the district court's determination. *See, e.g., United States v. Berrios,* 132 F.3d 834, 839 (1st Cir.1998) (upholding enhancement where defendant set the prices and locations of the transactions and used others to distribute drugs).

Despite this mass of evidence and the inhospitable standard of review, the appellant has a fallback position. He complains, in the alternative, that he should have received a lesser role-in-the-offense enhancement because he was only one of several management-level dealers. The

ble for the equivalent of 10,000 kilograms of marijuana would have sufficed to make his base offense level 36. *See* USSG § 2D1.1(c)(2).

top dog, he says, was a supplier ("John Doe").

This plaint is unavailing. Neither the fact that there may have been other dealers who exercised a modicum of authority over loosely related drug-trafficking operations nor the fact that a supplier may have had ultimate authority over the entire enterprise undercuts the district court's finding that the appellant functioned as an organizer or leader of a discrete part of the operation. *See* USSG § 3B1.1, cmt. (n.4) ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."); *see also United States v. Andujar*, 49 F.3d 16, 25 (1st Cir.1995).

That ends this aspect of the matter. We hold, without serious question, that the sentencing court did not clearly err in deeming the appellant an organizer or leader of the charged conspiracy.

## C.

### Career Offender Status

The appellant's final point pertains to his career offender status. He argues that the district court did not apply the career offender guideline properly. His argument has multiple dimensions.

■ We begin with bedrock: the parties and the lower court agreed that, for sentencing purposes, the appellant should be treated as a career offender. That classification was apt. *See* USSG § 4B1.1 (defining "career offender"); *United States v.*

*Chhien*, 266 F.3d 1, 10 (1st Cir.2001) (same). Thus, the career offender guideline supplied the rule of decision for sentencing purposes.

After defining the term "career offender," the guideline provides, with an exception not germane here, that:

> If the offense level for a career criminal from the table [in this section] is greater than the offense level otherwise applicable, the offense level from the table ... shall apply. A career offender's criminal history category in every case shall be Category VI.

USSG § 4B1.1 (Nov.1998).[3] The guideline then sets forth a tabulation of offense levels that are determined by reference to the statutory maximum sentences authorized for various offenses of conviction.

To apply the career offender guideline, then, the sentencing court must take the applicable offense level from the career offender table and compare it to the offense level that would be applicable absent a career offender designation.[4] If the former exceeds the latter, the court must use it in determining the defendant's GSR. If, however, the otherwise applicable offense level is greater than the offense level derived from the career offender table, then the otherwise applicable offense level is to be used in determining the GSR.

Following the method prescribed by section 4B1.1, the court below determined that the appellant's offense level under the career offender table was 37 but that, leaving the table to one side, his otherwise

---

3. We note that more recent editions of the sentencing guidelines contain slight variations in this language, but do not change it in any meaningful way.

4. The career offender guideline expressly provides that "[i]f an adjustment from § 3E1.1 (Acceptance of Responsibility) applies," the sentencing court should decrease the table-derived offense level "by the number of levels corresponding to that adjustment." USSG § 4B1.1. Due to this provision, we omit any further reference to the three-level credit for acceptance of responsibility received by the appellant. That credit affects equally both his table-derived offense level and his otherwise applicable offense level (and, thus, cancels itself out for present purposes).

applicable offense level (based on drug weight and role in the offense) was 40. The career offender guideline, quoted *supra*, required the district court to choose the higher of the two offense levels in imposing sentence. Because the otherwise applicable offense level exceeded the offense level specified in the career offender table, the court seized upon it. The court then reduced that offense level (40) by the three-level credit for acceptance of responsibility, *see supra* note 4, and used a total offense level of 37 in conjunction with a CHC of VI to ascertain the GSR.

The appellant first attacks the district court's decision to place him in CHC VI. This attack hinges on the proposition that, having determined to use the otherwise applicable offense level as the operative integer in the sentencing equation, the district court also should have used the appellant's otherwise applicable CHC—II—in conjunction with it (as opposed to marrying the otherwise applicable offense level with the CHC of VI assigned to career offenders). This raises a question of first impression in this circuit.[5]

■ We find the proposition advanced by the appellant at odds with the text of the career offender guideline. The career offender guideline mandates that as long as a defendant qualifies as a career offender and is to be sentenced pursuant to section 4B1.1, his "criminal history category in every case shall be Category VI." This plain language means precisely what it says: once it is determined that a defendant fits within the confines of the career offender taxonomy, he is automatically and irrevocably consigned to CHC VI. *See United States v. Hutman*, 339 F.3d 773,

775 (8th Cir.2003); *United States v. Webb*, 255 F.3d 890, 893 n. 2 (D.C.Cir.2001); *United States v. Marrone*, 48 F.3d 735, 740 n. 9 (3d Cir.1995); *see also United States v. Cyr*, 337 F.3d 96, 99 n. 2 (1st Cir.2002) (dictum).

An illustrative case is *United States v. Gay*, 240 F.3d 1222 (10th Cir.2001). There, the defendant qualified as a career offender but his otherwise applicable offense level exceeded his offense level under the career offender table (and, thus, was front and center for sentencing purposes). *Id.* at 1230. The court nonetheless placed the defendant in CHC VI. *Id.* On appeal, Gay argued—as does the appellant here—that because the sentencing court used the otherwise applicable offense level, it should not have kept him in CHC VI. The Tenth Circuit rejected this argument, holding that the plain language of section 4B1.1 meant that "the sentencing court must employ Category VI regardless of which offense level is applied." *Id.* at 1231.

■ We find that reasoning persuasive. We hold that, in a career offender case, a sentencing court's determination to use the otherwise applicable offense level rather than the offense level displayed in the career offender table neither relieves the defendant of career offender status nor countermands his assignment to CHC VI. He remains a career offender, *see* USSG § 4B1.1, and, as such, remains within CHC VI. Consequently, the district court did not err in its CHC determination.

The appellant's next argument is a nonstarter. He suggests that the district court gave only lip service to his career

---

5. Although we have never addressed this precise point, we have on two occasions left intact a sentencing court's calculation of a career offender's offense level based on the "otherwise applicable" offense level that si-

multaneously assigned the defendant to CHC VI. *See United States v. Lopez*, 299 F.3d 84, 87 n. 2 (1st Cir.2002); *United States v. Beasley*, 12 F.3d 280, 282 (1st Cir.1993).

offender status and, in fact, sentenced him as if he were not a career offender at all. This suggestion rests on the false assumption that the appellant was not sentenced under the career offender guideline.

To be sure, the sentencing court employed the otherwise applicable offense level rather than the offense level displayed in the career offender table. But that choice was itself dictated by section 4B1.1. Because the court determined the appellant's sentence pursuant to the career offender guideline, it follows that the appellant was sentenced as a career offender. *Accord United States v. Robinson,* 935 F.2d 201, 205–06 (11th Cir.1991).

▆▆▆ The appellant's final effort raises yet another question of first impression in this circuit. The appellant contends that the district court erred in not using the offense level specified in the career offender table. To support this contention, he reads the phrase "offense level otherwise applicable" in section 4B1.1 as referring only to a defendant's *base* offense level and observes that his table-derived offense level (37, before any credit for acceptance of responsibility) exceeded his otherwise applicable base offense level (36). We reject this reading.

Although section 4B1.1 does not expressly reference a defendant's total offense level, the phrase "offense level otherwise applicable" has been consistently interpreted to mean the offense level that results *after* warranted adjustments are made. *See, e.g., United States v. Jeppeson,* 333 F.3d 1180, 1183–84 (10th Cir. 2003); *United States v. Zimmer,* 299 F.3d 710, 721 (8th Cir.2002); *United States v. Ward,* 144 F.3d 1024, 1036 n. 7 (7th Cir. 1998). Given the sequence required by

the sentencing guidelines, this interpretation makes perfect sense.

USSG § 1B1.1 sets forth the sequence in which the various sections of the sentencing guidelines should be addressed. Under that paradigm, a sentencing court must first divine the applicable offense guideline and then establish the defendant's base offense level. USSG § 1B1.1(a)-(b). The court should then "[a]pply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three." *Id.* § 1B1.1(c). The court then proceeds to factor in any adjustments for acceptance of responsibility.[6] *Id.* § 1B1.1(e). Next, the court must select the applicable CHC and "[d]etermine from Part B of Chapter Four any other applicable adjustments." *Id.* § 1B1.1(f). This step brings into play, where applicable, the career offender adjustment (which is contained in Chapter Four). Finally, the court must calculate the defendant's GSR. *Id.* § 1B1.1(g).

The short of it is that the sentencing court must make most applicable adjustments to the defendant's offense level (including role-in-the-offense adjustments) before making a career offender adjustment under USSG § 4B1.1. It is this adjusted offense level that is compared with the offense level derived from the career offender table to determine which offense level should be used in a given case. *See Jeppeson,* 333 F.3d at 1183; *Ward,* 144 F.3d at 1036 n. 7.

Mindful of this sequencing, we hold that, for purposes of section 4B1.1, the offense level otherwise applicable must necessarily take into account any pertinent Chapter Three adjustments (including victim, role, and obstruction of justice adjustments) before it is compared to the table-derived

---

**6.** We skip over USSG § 1B1.1(d). That subsection, which addresses situations in which the court must consider multiple counts of conviction, is inapposite here.

offense level. We add, moreover, that this construction comports not only with the method of the sentencing guidelines but also with the policy underlying the promulgation of the career offender guideline. That guideline was written to give effect to congressional intent, expressed in 28 U.S.C. § 994(h), to punish repeat offenders more severely. *See United States v. Jackson,* 30 F.3d 199, 204 (1st Cir.1994) (explaining that "Congress has very specifically directed the Sentencing Commission to ensure that the guidelines provide for severe incarcerative sentences in [career offender] cases"); *Robinson,* 935 F.2d at 206 (discussing "Congress' intention that career offenders receive a sentence of imprisonment at or near the maximum authorized by statute"); *see also* USSG § 4B1.1, cmt. (backg'd.) (explaining that the aim of the career offender guideline is to give career offenders sentences "at or near the maximum term authorized" by law). The appellant's reading of section 4B1.1 would frustrate this intent.

### III.

#### Conclusion

We need go no further. For aught that appears, the district court did not clearly err in determining either drug quantity or role in the offense. After making those supportable determinations, the court perspicaciously construed the career offender guideline, derived the correct total offense level, applied the appropriate CHC, deduced the proper GSR, and imposed a lawful sentence.

*Affirmed.*