# United States Court of Appeals
## For the First Circuit

No. 21-1815

UNITED STATES OF AMERICA,

Appellee,

v.

JULIO MEJIA, a/k/a Carlos,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Gelpí, Circuit Judges.

Thomas J. Gleason and Gleason Law Offices, P.C. on brief for appellant.

Kenneth A. Polite, Jr., Assistant Attorney General, Criminal Division, United States Department of Justice, Lisa H. Miller, Deputy Assistant Attorney General, Criminal Division, W. Connor Winn, Criminal Division, Appellate Section, Darcie N. McElwee, United States Attorney, Benjamin M. Block, Chief, Appellate Division, Johnathan G. Nathans, Assistant United States Attorney, on brief for appellee.

November 8, 2022

**SELYA**, **Circuit Judge**.  In this case, the district court allowed the government to rescind a plea agreement previously entered into with defendant-appellant Julio Mejia and proceeded to sentence the defendant to a 162-month term of immurement.  The defendant appeals, arguing that the court should not have allowed the rescission of the plea agreement and that, compounding this blunder, the court miscalculated drug quantity and incorrectly imposed a role-in-the-offense enhancement.  Concluding, as we do, that the defendant is foraging in an empty cupboard, we affirm.

**I**

We briefly rehearse the relevant facts and travel of the case.  "Where, as here, a sentencing appeal follows a guilty plea, we glean the relevant facts from the change-of-plea colloquy, the unchallenged portions of the presentence investigation report (PSI Report), and the record of the disposition hearing."  United States v. Vargas, 560 F.3d 45, 47 (1st Cir. 2009).

In 2016, the authorities began investigating a sprawling drug-trafficking organization that was supplying significant amounts of cocaine and fentanyl to drug dealers throughout Maine, New Hampshire, and Massachusetts.  The defendant was involved hip-deep in the activities of the organization:  at least until the end of 2016, he received orders from customers, set drug prices, and arranged the itineraries for drug couriers.

In December of 2016, the defendant turned over his list of customers to an associate, Inyemar Manuel Suazo, and departed for the Dominican Republic. His departure left Suazo in charge. But after the defendant returned to the United States on May 7, 2017, he both resumed contact with Suazo and resumed involvement in the original drug-trafficking organization. By September, though, the two men had gone their separate ways, and the defendant began running his own drug-trafficking enterprise.

The defendant's new enterprise involved some persons who had been participants in the original drug-trafficking organization. This roster of past participants included a courier, Rafael Espinal-Calderon. The defendant continued distributing cocaine and fentanyl through this new network until his arrest in 2018.

In due course, a federal grand jury sitting in the District of Maine charged the defendant with conspiracy to distribute and to possess with intent to distribute 400 grams or more of a mixture or substance containing fentanyl. See 21 U.S.C. §§ 841(a)(1), 846. The defendant initially maintained his innocence, but he later changed his plea, pursuant to a written plea agreement. The district court accepted the defendant's guilty plea and ordered the preparation of a PSI Report.

When received, the PSI Report recommended a criminal history category of I and a total offense level (TOL) of forty-

three.  The TOL included a drug quantity attribution, see USSG §2D1.1, a role-in-the-offense enhancement based on the defendant's asserted leadership of "criminal activity that involved five or more participants," id. §3B1.1(a), and a reduction for acceptance of responsibility, see id. §3E1.1.  The guideline recommendations limned in the PSI Report yielded a guideline sentencing range of life imprisonment.

In March of 2019, the defendant entered into a cooperation agreement with the government, which both merged into and supplemented his plea agreement.  (For ease in exposition, we henceforth refer to the plea agreement and the cooperation agreement, collectively, as the "supplemented plea agreement.")  Pursuant to the supplemented plea agreement, the defendant pledged to assist the government's ongoing investigation into drug-trafficking activities in various ways (including testifying when requested).  For its part, the government pledged not to use any of the information provided by the defendant against him, to make his cooperation known upon his request, and to recommend a three-level reduction for acceptance of responsibility under USSG §3E1.1.

The defendant began cooperating with the government and continued his assistance until November 27, 2020.  At some time prior to that date, Suazo apparently approached the defendant, showed him a copy of the cooperation agreement, and threatened to

post it online if the defendant testified. Fearing for his and his family's safety, the defendant subsequently refused to testify against Suazo.

The government responded to this development by announcing that it would treat the supplemented plea agreement as a nullity. The defendant tried to parry this thrust: he moved either to scrap the indictment or to enforce the supplemented plea agreement because the government had breached the latter by withdrawing it "in bad faith." After determining that the defendant's failure to testify against Suazo constituted a material breach of the terms of the supplemented plea agreement, the court denied the motion.

On September 27, 2021, the district court convened the disposition hearing in the defendant's case. The government reminded the court that the supplemented plea agreement had been abrogated by the defendant's refusal to testify and, therefore, should be deemed withdrawn. The defendant did not contemporaneously object to the rescission of the supplemented plea agreement, but his counsel urged the court to acknowledge the defendant's cooperation when weighing the sentencing factors made pertinent under 18 U.S.C. § 3553(a). Consequently, the supplemented plea agreement was rejected by the court.

The disposition hearing devolved principally into an exchange of views about the appropriateness vel non of the drug-

quantity and role-in-the-offense recommendations contained in the PSI Report. Amidst the sparring, the government suggested a 240-month term of immurement, and the defendant suggested half that time.

Regarding drug quantity, the district court concluded that the PSI Report's figure (114,362.6618 kilograms of converted drug weight)[1] was "supportable based upon the testimony of runners like Espinal-Calderon and others." And with respect to the four-level role-in-the-offense enhancement, the court found that the evidence "without a doubt [] satisfie[d] the five participant level" and made "absolutely clear that this defendant was the leader."

After considering the section 3553(a) factors, the court concluded that the defendant "deserve[d] to be penalized far more heavily than the other members of the conspiracy." Even so, the court noted that the guideline sentencing range was "extraordinarily punitive and high" and that the defendant's cooperation, though not in full compliance with the supplemented plea agreement, ought to "have a major impact in terms of the sentence" to be imposed. The court settled upon a 162-month term

---

[1] Where, as here, more than one type of drug is involved in an offense, the quantity of each drug is multiplied by a conversion factor to yield converted drug weight, so that quantities of different drugs may be combined into a single number for purposes of establishing the defendant's base offense level. See USSG §2D1.1(c), n.(K).

of immurement — a downwardly variant sentence that amounted to one half of the bottom of the adjusted guideline sentencing range.

This timely appeal followed.

## II

In this venue, the defendant advances three principal claims of error.[2]  We address these claims sequentially.

## A

The defendant first challenges the district court's refusal to enforce his supplemented plea agreement.  He insists that the government remained bound to the terms of the supplemented plea agreement because his failure to testify against Suazo did not constitute a breach of his obligations under the agreement.[3]

In cases involving an alleged breach of a plea agreement, we review disputed factual questions (such as those pertaining to the terms of the agreement or a parties' conduct) for clear error.

---

[2] In addition to these claims of error, the defendant separately contends that the government breached the supplemented plea agreement when it failed to protect his identity from Suazo and when it argued for a sentence exceeding 150 months.  These contentions are undeveloped, and we deem them waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  And in all events, we note that the supplemented plea agreement contains neither a commitment to protect the defendant's identity nor a commitment to recommend a 150-month sentence.

[3] The defendant is not clear as to how the enforcement of the supplemented plea agreement would have worked to his advantage in this case.  But because we discern no breach of that agreement on the government's part, see text infra, we need not probe this point more deeply.

See United States v. Clark, 55 F.3d 9, 11 (1st Cir. 1995). Questions of law are reviewed de novo. See United States v. Almonte-Nuñez, 771 F.3d 84, 89 (1st Cir. 2014). Once any factual disputes are resolved, the question of whether a party "breached the terms of a plea agreement is usually a question of law, which we review de novo." Id. Inasmuch as cooperation agreements are analogous to plea agreements, see United States v. Lilly, 810 F.3d 1205, 1211 (10th Cir. 2016); United States v. Carrillo, 709 F.2d 35, 36 (9th Cir. 1983), we similarly afford de novo review to the question of whether a party breached the terms of a cooperation agreement.

With respect to the supplemented plea agreement, "contract law supplies a useful reference point." United States v. Alegria, 192 F.3d 179, 183 (1st Cir. 1999). If the language of an agreement "unambiguously resolves an issue, that usually ends the judicial inquiry." Id. So it is here. The agreement unambiguously requires that the defendant "testify . . . at any and all grand juries, trials or other official proceedings in which his testimony is requested." It also warns that the defendant's failure to "perform any obligations under this Agreement" will constitute a breach.

The defendant does not dispute that the supplemented plea agreement embodies these straightforward terms. Nor does he dispute that he did not comply with the government's request that

- 9 -

he testify against Suazo. It follows, we think, that his argument — that he did not breach the agreement by refusing to testify — necessarily fails.

The defendant attempts to confess and avoid. He argues that contract-law principles excused his non-performance. But as we explain below, the doctrines that he advances do not apply to the circumstances at hand.

First, the defendant seeks specific performance of the supplemented plea agreement under the doctrine of substantial performance. Cf. United States v. Doe, 233 F.3d 642, 644-47 (1st Cir. 2000) (evaluating whether defendant had cooperated with government to an extent sufficient to compel specific performance of his plea agreement). In essence, he contends that the supplemented plea agreement should be enforced despite his breach because his cooperation enabled the government to accomplish its main objectives. The district court rejected this claim — and so do we.

The district court explained that the doctrine of substantial performance does not apply if a party's breach is material. See, e.g., Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 9-12 (1st Cir. 2006) (upholding release of party from further performance after counter-party committed material breach); U.S. Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 49-50 (1st Cir. 2002) (rejecting argument for enforcement of contract

- 10 -

because arguing party had materially breached). A breach is material if it involves "an essential and inducing feature of the contract." Marketwatch.com, 444 F.3d at 11 (quoting Bucholz v. Green Bros. Co., 172 N.E. 101, 102 (Mass. 1930)). Here, the breach was material: the defendant's obligation to testify was essential to the supplemented plea agreement, was embodied in an express term in the agreement, and his refusal to testify broke a promise that had been a cornerstone of the government's decision to enter into that agreement. Moreover, the defendant's refusal to testify forced the government to nol pros its pending case against Suazo. See United States v. Suazo, 14 F.4th 70, 72-73 (1st Cir. 2021). Given these facts, the district court appropriately regarded the defendant's breach as material and, so, appropriately disregarded the doctrine of substantial performance.

Second, the defendant points to the doctrine of frustration of purpose. He contends that this doctrine applies because Suazo discovered his identity as an informant. We do not agree: frustration of purpose is a doctrine that comes into play when "the non-occurrence of [the frustrating event] was a basic assumption on which the contract was made." Restatement (Second) of Contracts § 265 (Am. L. Inst. 1981).

To amplify, the defendant has failed to show that ensuring his anonymity was a basic assumption underlying the supplemented plea agreement. In terms, the agreement extended no

assurance of anonymity to the defendant. And, furthermore, the agreement obligated the defendant to testify at an unlimited number of unspecified trials, during which his identity as an informant surely would have been disclosed. Seen in this light, it defies common sense to suggest — as the defendant does — that it was a "basic assumption" that Suazo would be kept in the dark and would never learn of the defendant's arrangement with the government.[4]

This leaves the defendant's contention that the district court erred in failing to invoke either 18 U.S.C. § 3553(e) or USSG §5K1.1, each of which enables a district court to consider a more lenient sentence. The former provision permits a district court to impose a sentence below the statutory minimum "[u]pon motion of the Government." 18 U.S.C. § 3553(e). The latter provision permits a district court to depart downward from a properly calculated guideline sentencing range, "[u]pon motion of the government," to reward a defendant's substantial assistance. USSG §5K1.1.

The common thread running through these provisions is that each provision is triggered only "upon motion of the government." The government made no such motion here — nor is

_____

[4] The defendant also makes a conclusory assertion that the government acted "in bad faith" in rescinding the supplemented plea agreement. But a showing of bad faith requires an evidentiary predicate, see Alegria, 192 F.3d at 187, and the defendant does not identify such a predicate here.

there any allegation that the government reneged on a promise to make such a motion. Viewed against this backdrop, the defendant's contention withers on the vine.

**B**

The defendant's next claim of error relates to the sentence imposed. A two-step pavane guides our inquiry. See United States v. Nuñez, 852 F.3d 141, 144 (1st Cir. 2017). "First, we resolve any claims of procedural error, including any claims that implicate the accuracy of the sentencing court's calibration of the [guideline sentencing range]." Id. If the sentence passes procedural muster, we then address any claim of substantive unreasonableness. See id.

In this instance, the defendant eschews any challenge to the substantive reasonableness of his sentence. Our review, therefore, is limited to his two claims of procedural error. Both claims were preserved below and, thus, engender review for abuse of discretion. See United States v. Rivera-Morales, 961 F.3d 1, 15 (1st Cir. 2020). That is not a monolithic standard: within it, "we assay the district court's factfinding for clear error and afford de novo consideration to its interpretation and application of the sentencing guidelines." United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013). In the process, we bear in mind that — ordinarily — "facts found by a sentencing court must be

- 13 -

supported by a preponderance of the evidence." United States v. Ortiz-Carrasco, 863 F.3d 1, 3 (1st Cir. 2017).

**1**

Drug quantity is an important integer in the sentencing calculus, see United States v. Soto-Villar, 40 F.4th 27, 31 (1st Cir. 2022), and the defendant's first claim of procedural error targets the district court's drug-quantity determination. Specifically, the defendant contends that the court erred in overestimating the amount of drugs for which he was accountable. See USSG §2D1.1. In support, the defendant asserts that the drug-quantity calculation derives from historical evidence of transactions for which he was not responsible.

"[D]rug-quantity determinations are quintessentially factual in nature, and we review them for clear error." United States v. Dunston, 851 F.3d 91, 101 (1st Cir. 2017). In determining drug quantity, a sentencing court's findings "need not be precise to the point of pedantry." United States v. Ventura, 353 F.3d 84, 88 (1st Cir. 2003). Rather, "[s]uch findings may be based on approximations drawn from historical evidence as long as those approximations represent reasoned estimates of drug quantity." Id.

The district court accepted the PSI Report's estimate that the defendant was responsible for 114,362.6618 kilograms of converted drug weight, see supra note 1, comprising quantities of

cocaine and fentanyl attributable to the conspiracy during the defendant's involvement (that is, up until September of 2017). See United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004); USSG §1B1.3(a). The evidence supporting this calculation included seizures, intercepted telephone communications, information supplied by former couriers, and data provided by a close associate of the defendant. Notably, the close associate said that the defendant purchased half a kilogram of fentanyl and cut it into three-and-one-half kilograms of fentanyl every two or three weeks. Based on this last description, the PSI Report estimated that the defendant distributed three-and-one-half kilograms of a substance or mixture containing fentanyl every six weeks (a total of over forty-five kilograms of fentanyl).

The defendant posits that the district court improperly used historical evidence in two ways. First, he submits that much of the attributed drug weight came from transactions that occurred while he was in the Dominican Republic and thereafter. Building on this foundation, he argues that he should not be held accountable for the drugs that were trafficked after he left the United States. This argument, though, gains him no traction: a defendant is responsible "not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." Santos, 357 F.3d at 140.

To be sure, the defendant alleges that he separated entirely from the drug-trafficking organization while he was abroad and, thus, should not be held responsible for drugs trafficked during and after that interval. This allegation cannot withstand scrutiny. Where, as here, "a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated." United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002) (quoting United States v. Elwell, 984 F.2d 1289, 1293 (1st Cir. 1993)). A coconspirator's claim that he has withdrawn from the conspiracy thus "requires more than an empty claim of disaffection." Dunston, 851 F.3d at 103. To succeed on such a withdrawal claim, a coconspirator "must act affirmatively either to defeat or disavow the purposes of the conspiracy." United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam). Typically, this requires "evidence either of a full confession to authorities or a communication . . . to his co-conspirators that he has abandoned the enterprise and its goals." Id. Nothing of the sort is reflected in the record.

Arguing to the contrary, the defendant insists that he cut ties with the drug-trafficking organization and its goals when he gave his customer list to Suazo, left the country, and pursued other work opportunities. But a "[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal."

Id. (quoting United States v. Dunn, 758 F.2d 30, 37 (1st Cir. 1985)); see United States v. David, 940 F.2d 722, 739-40 (1st Cir. 1991) (concluding that defendants did not withdraw from conspiracy because defendants "attempted to resume more active participation . . . by reestablishing their supply relationship [with a coconspirator]").  Although the record indicates a hiatus in the defendant's conspiratorial activities, it lacks sufficient evidence to establish that the defendant actually withdrew from the conspiracy.  After all, the defendant lost no time in resuming contact with Suazo shortly after his return to the United States — and he continued distributing drugs.  In the absence of any compelling evidence of withdrawal, we are satisfied that the record supports a finding that the defendant remained involved in the conspiracy.

In a nutshell, the record supports the district court's finding that the challenged quantities fell within the scope of the conspiracy and were reasonably foreseeable to the defendant. We hold, therefore, that the district court's use of historical evidence regarding transactions during the defendant's sojourn in the Dominican Republic and thereafter until September of 2017 was not clearly erroneous.  No more was exigible to attribute those drug quantities to the defendant.  See Dunston, 851 F.3d at 101; Santos, 357 F.3d at 140.

The defendant also contests the court's reliance on anecdotal evidence, which accounts for the total amount of fentanyl and most of the cocaine attributable to him. He declares that these transactions are "projected, estimated, [and] unverified." And he specifically disputes the court's acceptance of Espinal-Calderon's cocaine drug quantity estimate because the estimate was "self-serving."

This dog will not hunt. We have stated before, and today reaffirm, that "a sentencing court has wide discretion to decide whether particular evidence is sufficiently reliable to be used at sentencing." United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010). In the context of drug-trafficking transactions, "[d]etermining drug quantities after the fact is . . . likely to require a careful sorting of anecdotal information and the exercise of sound judgement." United States v. Bernier, 660 F.3d 543, 548 (1st Cir. 2011). The upshot is that "a sentencing court's selection from among plausible alternative scenarios or divergent inferences presented by the record cannot be clearly erroneous." Id. at 547.

The court below determined that the calculations were "supportable based upon the testimony of runners . . . and others." The court explained that "[t]he fact that Espinal-Calderon never physically met the defendant or wasn't sure of his real name does not matter because the identity of the defendant

comes from others and his role in the organization." In addition, the court noted that the defendant's close associate had described the defendant's handling of drugs in a way that was "consistent with the defendant's own proffer." So, too, the court observed that the probation department had exercised "leni[ency]" when estimating the amount of fentanyl derived from the close associate's statements by expanding the estimated two-to-three-week intervals to six weeks. On this scumbled record, the district court's drug-quantity determination was a reasoned estimate and, thus, not clearly erroneous.[5]

**2**

This brings us to the defendant's last claim of error: his entreaty that the district court should not have deployed a four-level role-in-the-offense enhancement in calculating his guideline sentencing range. See USSG §3B1.1(a). In support, he argues that Suazo was the clear leader of the drug-trafficking organization.

We begin with the basics. USSG §3B1.1(a) provides for a four-level enhancement if "the defendant was an organizer or

---

[5] In his briefing, the defendant requests an evidentiary hearing on the drug-quantity issue. This request was not made below and, thus, we deem it waived. See United States v. Maglio, 21 F.4th 179, 187 n.4 (1st Cir. 2021); see also United States v. Adams, 971 F.3d 22, 37 (1st Cir. 2020) (holding that appellant's request for a hearing "falls squarely within the general rule that a party cannot ask the court of appeals for relief that he did not seek in the district court").

leader of a criminal activity that involved five or more participants or was otherwise extensive." As to this enhancement — as with all upward adjustments under the sentencing guidelines — the government must carry the devoir of persuasion by a preponderance of the evidence. See United States v. Rivera, 51 F.4th 47, 51 (1st Cir. 2022). Discussing this enhancement, we recently explained that "the government's evidence must satisfy both a scope requirement (that is, the evidence must show that the enterprise involved five or more participants or was otherwise extensive) and a status requirement (that is, that the defendant acted as an organizer or leader of the enterprise)." Id.

A criminal enterprise that conducted its operations under the aegis of a formal organization chart would be a rarity. Typically, such enterprises are structured informally and, therefore, a defendant's role in the enterprise "is necessarily fact-specific." United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995). As a result — and absent a mistake of law — role-in-the-offense disputes "will almost always be won or lost in the district court." Id.

Here, the scope requirement is plainly satisfied: the record paints a picture of a drug-trafficking organization with many tentacles, and the defendant does not dispute that the organization involved five or more participants. The factual question, then, is whether the record supports the district court's

finding that the defendant was a leader of the organization. Reviewing for clear error, see Ventura, 353 F.3d at 89, we think that it does.

The record shows with conspicuous clarity that the defendant was the point man with whom drug dealers regularly placed their orders — and he set the prices for the conspiracy's wares. In addition, he gave the drug couriers their assignments on numerous occasions. Put bluntly, he was a hub of the drug-trafficking organization's wide-ranging activities.

The defendant's only rejoinder to this factual panoply is his argument that he could not be deemed a leader because Suazo was the leader. This argument, however, rests on a faulty premise. The commentary to the sentencing guidelines makes pellucid that there can "be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." USSG §3B1.1, cmt. 4. We deem this commentary authoritative. See United States v. Rivera-Berríos, 902 F.3d 20, 24-25 (1st Cir. 2018). Accordingly, we hold today — as we have held in past cases, see, e.g., United States v. Ilarraza, 963 F.3d 1, 14 (1st Cir. 2020); Ventura, 353 F.3d at 90 — that for sentencing purposes, there can be more than one leader or organizer of criminal activities. This is such a case.

**3**

To say more would be to paint the lily.  Having carefully reviewed the defendant's claims of procedural error, we discern none.

**III**

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**<u>Affirmed</u>**.